**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| BENEDICTINE COLLEGE, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>ZURICH AMERICAN INSURANCE COMPANY,<br><br>    Defendant. | Case No.<br><br>COMPLAINT<br><br>Class Action<br><br>DEMAND FOR JURY TRIAL |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Benedictine College ("Plaintiff"), individually and on behalf of all other similarly situated institutions of higher education, for its Class Action Complaint against Defendant Zurich American Insurance Company ("Defendant"), states and alleges as follows:

**NATURE OF ACTION**

1. Institutions of higher education have been hit particularly hard by the ongoing COVID-19 pandemic. Since the disease began to spread rapidly across the country in late February and early March 2020, almost every college and university has taken drastic and unprecedented action to protect its students, faculty, staff, and the general public from COVID-19. This was no easy task. Most institutions of higher education are more like small- or medium-sized cities than mere schools. In addition to educating the future of America, they provide housing for hundreds or thousands of students; serve and sell food; operate stores; employ large numbers of teachers, administrators, and other employees; sponsor sports teams; host public events; and perform many other services.

2.      On March 6, 2020, the University of Washington became the first major university to cancel in-person classes and exams.[1] By the middle of March, others across the country had followed suit and more than 1,100 colleges and universities in all 50 state have canceled in-person classes and shifted to online-only instruction. Due directly to the pandemic, these institutions also: closed dorms and sent students home; shuttered all dining halls; closed administrative buildings; canceled spring sports seasons; canceled graduation ceremonies; closed campus entirely to all but a few essential personnel; and took many other precautions.

3.      Although the spring semester has now concluded for virtually all institutions, the effects of the pandemic continue to deprive Plaintiff of the use of its campuses and property. Large gatherings are still prohibited. Residence halls are still closed. Summer classes are being held online. Events that would normally take place on campus during the summer – like summer camps – have been canceled in their entirety. And it is still unclear whether students will be permitted to return to campus for the fall semester, which looms just around the corner.

4.      Apart from the nightmarish logistical challenge, and the serious disruption to their core mission of education, the measures colleges and universities have taken as a result of COVID-19 have had a devastating financial impact. After closing of dorms and dining halls, colleges and universities provided room-and-board reimbursements, often totaling in the millions of dollars. Other substantial costs include lost revenue from on-campus events; lost revenue from summer classes and programs; increased costs to clean and disinfect the campus as a result of COVID-19; and many others. And these losses may continue or worsen if the measures continue into the fall semester.

---

[1] https://www.ncsl.org/research/education/higher-education-responses-to-coronavirus-covid-19.aspx

5.      Plaintiff is one such institution which has suffered substantial financial losses due to COVID-19.

6.      Fortunately – or so it thought – Plaintiff had purchased all-risk commercial property insurance policies from Defendant to protect it in the event of an event such as COVID-19. The Policy provides hundreds of millions of dollars in coverage for a wide variety of losses, including loss of use of property, business interruption, and property damage.

7.      Plaintiff promptly made a claim for coverage under the Policy. But Defendant has refused to honor its promise to provide the protection that Plaintiff purchased. Defendant has not paid any funds to date. Rather, it has indicated – incorrectly – that the Policy does not cover losses of the type Plaintiff has suffered and that it specifically excludes coverage for losses related to viruses like COVID-19.

8.      Plaintiff is not unique. The insurance industry – and this Defendant in particular – appears to be taking a uniform approach to the current pandemic:  deny coverage even when the policy they drafted and offered to insureds, and the policy paid for by the insureds, does not contain an exclusion for pandemic- or virus-related losses. Based on other lawsuits and other publicly available information, it appears that Defendant is taking a consistent position with other insureds – including other higher education institutions – across the country.

9.      Defendant's conduct is particularly galling in light of the huge amount of premiums insurers like Defendant receive annually. According to information published by the Insurance Information Institute, the U.S. insurance industry collected net premiums of $1.22 trillion in 2018. Premiums recorded by property/casualty insurers accounted for 51% of that amount. Between 2014 and 2018, these insurers wrote net premiums each year of between $497 billion to $612.6 billion but only incurred losses of between $277.7 billion and $360.9 billion.

10.     This is a class action for declaratory judgment and breach of contract arising from Defendant's refusal to pay claims related to COVID-19 as required by its property insurance agreements it sold to Plaintiff and other institutions of higher education.

## PARTIES

11.     Plaintiff Benedictine College is a Kansas nonprofit corporation with is principal place of business in Atchison, Kansas.

12.     Plaintiff is a private Benedictine liberal arts college in Atchison, Kansas. It was founded in 1971 by the merger of St. Benedict's College (founded in 1858) for men and Mount St. Scholastica College (founded in 1923) for women. It now serves over 2,300 students.

13.     As a result of, and in connection with the COVID-19 pandemic and related governmental restrictions on non-essential business, Plaintiff ceased normal operations and effectively closed its campus in mid-March 2020. The closure of residence halls was announced on March 19, and students were required to vacate campus by March 22. Plaintiff has issued refunds to students or otherwise lost revenue related to room, board, and fees totaling in excess of $1 million, and has suffered, and will continue to suffer other substantial losses and damages. Campus facilities remain closed.

14.     It is more likely than not that by at least early March 2020 other persons infected with COVID-19 were present on Plaintiff's campus and thereby caused the virus to be present throughout Plaintiff's insured property and surrounding areas.

15.     As a result, Plaintiff's insured property was rendered unsuitable for its intended use and was subject to a variety of limitations, restrictions, and prohibits, including by orders of applicable government entities ("Stay at Home Orders"), which are matters of public record.

16.    Defendant Zurich American Insurance Company, is an Illinois corporation, with its principal place of business in Schaumburg, Illinois.

## JURISDICTION AND VENUE

17.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action in which at least one member of the class is a citizen of a state different from Defendant, the amount in controversy exceeds $5 million exclusive of interest and costs, and the proposed class contains more than 100 members.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to Plaintiff's causes of action occurred in this judicial district and division. The Policy at issue covers Plaintiff's campus and other property located in the State of Kansas.

## FACTUAL BACKGROUND

19.    The novel coronavirus – named "severe acute respiratory syndrome coronavirus 2" or "SARS-CoV2" – has spread widely and rapidly across the United States. The illness related to SARS-CoV-2 is "novel coronavirus disease 2019," commonly abbreviated to "COVID-19." Although the virus and related illness are distinct, for purposes of this Complaint, Plaintiff refers to both interchangeably as "COVID-19."

20.    Over 300 Kansans and over 140,000 Americans have died of COVID-19 and there have been nearly 24,000 confirmed COVID-19 cases in Kansas and over 3.8 million confirmed cases in the United States as of the date of this filing, according to the Coronavirus Resource Center at Johns Hopkins University. *See also* Centers for Disease Control and Prevention ("CDC") data.

21.     Plaintiff's insured property has been rendered unsuitable for its intended use and has been subject to a variety of limitations, restrictions, and prohibitions, including by government Stay at Home Orders imposed by the State of Kansas and Atchison County, Kansas.

22.     Plaintiff also imposed limitations, restrictions, and prohibitions due to the dangerous condition caused by the presence of COVID-19.

23.     Orders restricting Plaintiff's operations are still in effect in the State of Kansas and Atchison County, Kansas.

### *COVID-19*

24.     A growing body of evidence suggests that the virus transmits both through droplets, when someone sneezes and coughs, and aerosols, which are produced by normal breathing.

25.     Aerosols are particularly concerning because unlike droplets, which stay airborne for only a few seconds, aerosols are water droplets suspended in air and can remain suspended for hours, until gravity ultimately forces them to the nearest surface below.

26.     Consequently, aerosols can spread widely through air flow and settle on surfaces hundreds of feet away from any infected individual. Thus, someone not even in the vicinity of an infected person can unknowingly touch an infected surface, later touch their face, and become infected.

27.     As a result, at least 42 states and countless local governments issued substantially similar "stay at home" orders, the purpose of which was to mitigate and slow the spread of COVID-19.

28.     According to the CDC, everyone is at risk of getting COVID-19. The virus can spread by respiratory droplets when an infected person coughs, sneezes, or talks. A person can

become infected from respiratory droplets or potentially by touching a surface or object that has the virus on it and then by touching the mouth, nose, or eyes.[2]

29.     According to studies, the virus can live on surfaces for several days if not longer.[3] The New England Journal of Medicine reported finding that experimentally-produced aerosols containing the virus remained infectious in tissue-culture assays, with only a slight reduction in infectivity during a 3-hour period of observations. "Aerosols from infected persons may therefore pose an inhalation threat even at considerable distances and in enclosed spaces…."[4]

30.     The study also found that COVID-19 was detectable for up to four hours on copper, up to 24 hours on cardboard, and up to three days on plastic and stainless steel.[5]

31.     All of these materials are used by Plaintiff throughout its facilities and operations.

32.     The study's results indicate that individuals can become infected with COVID-19 through indirect contact with surfaces or objects used by an infected person, whether they were symptomatic or not.

33.     A consensus appears to be emerging that COVID-19 can travel through the air via aerosols. For example, aerosol scientist Lidia Morawska of the Queensland University of Technology in Brisbane, Australia told *Nature* that, "In the minds of scientists working on this, there's absolutely no doubt that the virus spreads in the air. This is a no-brainer."[6]

34.     An April 2020 study published in the journal *Emerging Infectious Diseases* found a wide distribution of COVID-19 on surfaces and in the air about *13 feet* from patients in two hospital wards in Wuhan, China, leading the authors to conclude that the virus spreads in aerosols

---

[2]     https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf
[3]     https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf
[4]     https://www.nejm.org/doi/full/10.1056/NEJMc2009324
[5]     https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces
[6]     https://www.nature.com/articles/d41586-020-00974-w

in addition to large respiratory droplets. The investigators found evidence of the virus in swabs of floors, computer mice, trash bins, bed handrails, patients' face makes, health workers' personal protective equipment, and air vents.[7]

35.     The authors also surmised that the high rate of positivity for floor samples in the hospital strongly suggest that droplets fall to the ground and then are spread via patients' shoes. For example, every sample tested from the pharmacy floor tested positive for COVID-19 even though no patients were housed there.[8]

36.     Another study conducted in Wuhan indicates that staff movement, floor cleaning, and the removal of personal protective equipment could transmit the virus through the re-suspension of virus-contaminated aerosols.[9]

37.     Kimberly Prather, an aerosol chemist at the University of California, San Diego told *Science* magazine: "I'm relieved to see aerosolization is accepted. This added airborne pathway helps explain why it is spreading so fast."[10]

38.     Aerosol particles are held in the air by physical and chemical forces. The suspended particles remain for *hours or more*, depending on factors such as heat and humidity. If virus particles can be suspended in air for more than a few seconds, like, for instance, the measles virus can, then anyone passing through could become infected by a pathogenic aerosol cloud. And the virus can travel long distances and land on surfaces, only to be stirred back up into the air later by cleaning or other disturbances.

---

[7]     https://www.cidrap.umn.edu/news-perspective/2020/04/study-finds-evidence-covid-19-air-hospital-surfaces

[8]     https://www.cidrap.umn.edu/news-perspective/2020/04/study-finds-evidence-covid-19-air-hospital-surfaces

[9]     https://www.biorxiv.org/content/10.1101/2020.03.08.982637v1

[10]    https://www.sciencemag.org/news/2020/04/you-may-be-able-spread-coronavirus-just-breathing-new-report-finds#

39.    The SARS virus that caused a 2003 epidemic is a coronavirus and is similar to COVID-19. As a result, the behavior of SARS during the 2003 epidemic provided evidence about any aerosol risk from COVID-19.

40.    A 2014 analysis published in the journal *Clinical Infectious Diseases* investigated a seemingly puzzling outbreak in a Hong Kong apartment complex whose residents had not been in close contact with each other.[11] The study found that "airborne spread was the most likely explanation, and the SARS coronavirus could have spread over a distance of 200 meters," or about 600 feet.[12]

41.    The implications of airborne spread of the virus are extremely serious. Airborne spread means that the virus can travel long distances from any infected person. It can then infect someone who unknowingly walks through a pathogenic cloud. It can also infect someone by settling on a physical surface, which someone touches and later becomes infected. And regardless of the transmission method, the evidence suggests that COVID-19 can be transmitted by shoes even once it reaches the ground.

42.    State and local governments have determined that without the Stay at Home Orders, COVID-19 could spread rampant throughout the community.

43.    The Stay at Home Orders in and around Plaintiff's property also explicitly acknowledge that COVID-19 causes direct physical damage and loss to property:

a.   on July 7, 2020, Atchison County, Kansas issued an updated Emergency Order related to COVID-19 stating that "the worldwide outbreak of COVID-19 and the resulting epidemic in Kansas continue to threaten the life and health of our

---

[11]      https://academic.oup.com/cid/article/58/5/683/365793
[12]      *Id.*

citizens as well as the economy and remains a public disaster affecting life, health, **property**, and the public peace"[13] (emphasis added);

b. the Stay at Home Order from nearby Johnson County, Kansas states that COVID-19 "endanger[s] health, safety and welfare of persons and **property** within the border of Johnson County, Kansas" and that it "remains a public disaster affecting life, healthy, **property**, and the public space."[14] (emphasis added).

44.      Kansas and Atchison County still have modified Stay at Home Orders in place which continue to affect Plaintiff's operations.

### *The Zurich Policy*

45.      To protect itself against risks like COVID-19, Plaintiff purchased the Policy from Defendant. The Policy was in effect at the time of the outbreak. Plaintiff paid all premiums required by the Policy.

46.      Plaintiff is the Named Insured under the Policy.

47.      Defendant is the effective and liable insurer of the Policy and policies meeting the class definition.

48.      Generally, under property insurance policies like those issued by Defendant to Plaintiff and class members, the insuring agreements provide coverage for all risks of physical loss of or damage to property, unless specifically excluded.

---

[13]      https://www.atchisoncountyks.org/DocumentCenter/View/2246/Atchison-County-Local-Heath-Official-Order-2020-08-Phase-35

[14]      https://www.jocogov.org/sites/default/files/documents/CMO/JoCo%20Public%20Health%20Officer%20Stay%20at%20Home%20Order%203-22-20.pdf

49.     The Policy is an "all-risk" policy. It covers "direct physical loss of or damage caused by a Covered Caused of Loss to Covered Property." Ex. A at 14. "Covered Cause of Loss" is defined as "all risks of direct physical loss of or damage from any cause unless excluded." *Id.* at 64. The Policy provides coverage up to a limit of $100,000,000.

50.     One section of the Policy excludes "Contamination, and any cost due to Contamination, including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy…." Ex. A at 23.

51.     The Policy defines "Contamination" as "any condition of property due to the actual presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, **virus**, disease causing or illness cause agent, Fungus, mold or mildew." Ex. A at 64 (emphasis added).

52.     However, the Policy contains an "Amendatory Endorsement" which explicitly *removes* the word "virus" from the definition of "Contamination" and also the definition of "Contaminant." *See* Ex. A at 118-121. Specifically, the definition of "Contamination" on pg. 64 of the Policy containing the word "virus" "is deleted" and "replaced by" the following: "Contamination (Contaminated) – Any condition of property due to the actual presence of any Contaminant(s)." *Id.* at 120.

53.     The "Amendatory Endorsement" then provides that the definition of "Contaminant" on pg. 64 of the Policy "is deleted" and "replaced with" the following: "Contaminant(s) – Any solid, liquid, gaseous, thermal or other irritant, including but not limited to smoke, vapor, soot, fumes, acids alkalis, chemicals, waste (including material to be recycled, reconditioned or reclaimed), other hazardous substances, Fungus or Spores." Ex. A at 120.  The word "virus" is specifically omitted.

54.     The "Amendatory Endorsement" removing "virus" from the Contamination exclusion in the Policy states that it applies to the entire Policy. Ex. A at 118 ("THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.").

55.     No other portion of the Policy purports to exclude viruses from coverage under the Policy. Nor does Plaintiff's Policy contain an exclusion for "pandemics," "communicable disease," or anything similar.

56.     The decision by Defendant to explicitly remove the word "virus" from the Contaminants exclusion evinces a clear intent by Defendant to provide coverage for viruses, like COVID-19, under the Policy.

57.     This is particularly true because the risk of a virus like COVID-19 was foreseeable to, if not foreseen by, insurance companies like the Defendant. The Insurance Services Office ("ISO"), an organization that provides policy writing services to insurers, has recognized for years that a virus can constitute physical damage to property. Specifically, in 2006, it announced the submission of an exclusion of loss "due to disease-causing agents such as viruses and bacteria."

58.     In connection with circulating the virus exclusion, it sent the following statement to state insurance regulators:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

59.     Despite the availability of a specific exclusion for viruses, Plaintiff's Policy contains no such exclusion, and, in fact, Defendant chose to expressly remove an exclusion that might apply to viruses from the Policy.

60.     Because damage due to viruses constitute physical damage and loss under the Policy, and the Stay at Home Orders have caused Plaintiff to have lost the use of its premises for their intended purpose, Plaintiff's losses are covered under the Policy. Moreover, Plaintiff suspended operations and effectively closed campus due to COVID-19.

61.     The Policy provides coverage for several different types of losses arising from COVID-19 that are relevant here, including, but not limited to, the following.

62.     The Policy provides coverage for **"Time Element"** loss sustained due to the necessary suspension of operations caused by direct physical loss of or damage to the insured property. Exhibit A at 27. "Gross earnings loss" is the "actual loss sustained" under Time Element coverage. *Id.* at 27. Gross earnings includes "income derived from the Insured's business activities." *Id.* at 28. Plaintiff has suffered Time Element losses due to COVID-19.

63.     The Time Element section also covers **"Extra Expense."** Ex. A at 29. Extra Expenses are expenses incurred "to resume and continue as nearly as practicable the Insured's normal business activities that otherwise would be necessarily suspended" due to direct physical loss of or damage to property. *Id.* Plaintiff has incurred Extra Expenses due to COVID-19.

64.     The Policy also provides coverage for an interruption to business caused by an order from a **"Civil or Military Authority."** Exhibit A at 34. Specifically, the Policy covers "the actual Time Element loss sustained by the Insured…resulting from the necessary Suspension of the Insured's business activities at an Insured Location if the Suspension is caused by order of civil or military authority that prohibits access to the Location." *Id.* The governmental order must result

from a response to "direct physical loss of or damage caused by" a cause of loss covered by the Policy. *Id.* Access to Plaintiff's property has been limited, restricted, and prohibited in part or in total due to the presence and threat of COVID-19 and related Stay-at-Home Orders.

65.     The Policy also provides "**Ingress and Egress**" coverage, which requires Defendant to pay for "the actual Time Element loss sustained by the Insured…resulting from the necessary suspension of the Insured's business activities at an Insured Location if ingress or egress to that Insured Location by the Insured's suppliers, customers, or employees is prevented by physical obstruction due to direct physical loss of or damage caused by" a cause of loss covered by the Policy. *Id.* Ingress to and egress from Plaintiff's property have been prevented due to COVID-19.

66.     The Policy also provides coverage for **"Decontamination Costs,"** which covers "the increased cost of decontamination and/or removal of…Contaminated Covered Property" if "Covered Property is Contaminated from direct physical loss of or damage caused by" a cause of loss covered by the Policy. Ex. A at 36. Plaintiff has incurred Decontamination Costs due to COVID-19.

67.     The Policy also provides additional coverages that apply to Plaintiff's claim, including, but not limited to **"Extended Period of Liability"** Time Element coverage; **"Contingent Time Element"**; **"Expediting Costs"**; and **"Protection and Preservation of Property"**. *See* Ex. A.

## CLASS ACTION ALLEGATIONS

68.     Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), 23(b)(3) and/or 23(c)(4), Plaintiff brings this action on behalf of itself and all others similarly situated, and seeks to represent the following nationwide classes:

a. **Nationwide Declaratory Judgment Class.** All institutions of higher education that are covered by one of the Defendant's policies in effect during the COVID-19 pandemic.

b. **Nationwide Breach Class.** All institutions of higher education that are covered by one of the Defendant's policies in effect during the COVID-19 pandemic.

c. *Kansas Subclass.* All institutions of higher education that purchased one of Defendant's Policies in Kansas and are covered by one of the Defendant's policies in effect to COVID-19.

69.     Plaintiff's Classes satisfy the numerosity, commonality, typicality, adequacy, and superiority requirements of a class action under Rule 23, as set forth more fully herein.

70.     **Numerosity.** COVID-19 has impacted thousands of higher education institutions across the country and Defendant is a nationwide insurer with, on information and belief, hundreds or more policies issued with the relevant provisions. Consequently, the Classes each number in at least the hundreds and most likely thousands, and thus the numerosity standard is satisfied. Moreover, because the members of the Classes are geographically dispersed across the country, and members of the Kansas Subclass are geographically dispersed across the state, if not elsewhere, joinder of all Class members in a single action is impracticable. Class members and Kansas Subclass members may be informed of the pendency of this class action through direct mail or other means based on Defendant's records of its policyholders.

71.     **Commonality.** There are questions of fact and law common to the Classes that predominate over any questions affecting only individual members. The questions of law and fact common to the Class arising from Defendant's actions include, without limitation, the following:

a.   Does the Policy cover losses resulting from the COVID-19 pandemic?

b.   Does the Policy cover losses resulting from state and local Stay At Home Orders requiring the suspension or reduction in business?

c.   Has Defendant wrongfully denied claims for business losses resulting from COVID-19 and/or the Stay at Home Orders?

d.   Do any of the following provisions in the Policy cover losses due to COVID-19: (i) physical loss of or damage to property; (ii) time element; (iii) contingent time element; (iv) civil or military authority; (v) ingress/egress; (vi) extra expense; (vii) decontamination costs; (x) expediting costs; and/or (xi) protection and preservation of property?

e.   Has Defendant breached its Policy by refusing to cover COVID-19 related losses?

f.   Are Class members entitled to reasonable attorneys' fees and expenses?

72.   **Predominance.** The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness, and equity to other available methods for the fair and efficient adjudication of the claims asserted herein. Specifically, thousands of institutions of higher education are impacted by Defendant's denial of coverage for COVID-19 losses and their claims arise from a common factual predicate, which is the nationwide shutdown and suspension of activities due to the virus.

73.   **Typicality.** Plaintiff's claims are typical of those of the Classes as Plaintiff was subject to the same or similar policy provisions and the losses for all members relate to COVID-19 and the related closure orders and the claims arise from the same legal theories.

74.   **Superiority.** A class action is the appropriate method for the fair and efficient adjudication of this controversy. Defendant has acted or refused to act on grounds generally applicable to the Class and Kansas Subclass. The presentation of separate actions by individual Class members and Kansas Subclass members would create a risk of inconsistent and varying

adjudications, establish incompatible standards of conduct for Defendant, and/or substantially impair or impede the ability of Class members to protect their interests.

75. **Adequacy**. Plaintiff is an adequate representative of the Class and Kansas Subclass because it is a member of the Class and its interests do not conflict with the interests of those it seeks to represent. The interests of the Class members will be fairly and adequately protected by Plaintiff and its counsel, who have extensive experience prosecuting complex class litigation.

76. **Declaratory Relief and certification under Rule 23(b)(2) of the Federal Rules of Civil Procedure**. On information and belief, Defendant has refused, or intends to refuse, coverage due to COVID-19 business interruption and other covered losses for all, or most, policyholders with covered Policies and final injunctive and/or declaratory relief mandating that Defendant cover the losses of Class members is appropriate respecting the class as a whole.

77. **Issue Class and Modification of Class Definitions and Creation of Subclasses**. In the alternative, Plaintiff reserves the right to seek certification of one or more common issues pursuant to Rule 23(c)(4). In addition, Plaintiff reserves the right to modify the definitions of the class and/or create subclasses either by amendment to the complaint or by motion for class certification, including but not limited to subclasses for policyholders under specific Policy provisions.

<u>**COUNT I: DECLARATORY RELIEF**</u>
**(On behalf of Nationwide Declaratory Judgment Class and Kansas Subclass)**

78. The preceding paragraphs are incorporated by reference as if fully alleged herein.

79. The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, allows this Court to declare the rights and other legal relations of the parties to this dispute.

80. An actual controversy has arisen and now exists between Plaintiff and the class, on the one hand, and Defendant, on the other hand, concerning the respective rights and duties of the

parties under the Policy. In May 2020, Plaintiff requested coverage for COVID-19 related losses. Defendant has stated that the Policy does not provide coverage for COVID-19 related losses. Defendant is in breach of its obligations by refusing to provide coverage under the Policy. Moreover, upon information and belief, Defendant has refused other, similar claims claiming that COVID-19 losses are not covered by the Policy.

81.     Plaintiff contends that Defendant has breached the Policy in the following respects:

     a.     Plaintiff and the class have suffered losses due to COVID-19 covered by the Policy.

     b.     Defendant is obligated to pay Plaintiff and the class for those losses.

     c.     Defendant has failed to pay Plaintiff and the class for those losses.

82.     Plaintiff therefore seeks a declaration of the parties' respective rights and duties under the Policy and requests the Court declare the aforementioned conduct of Defendant unlawful and in material breach of the policies so that future controversies may be avoided.

## COUNT II: BREACH OF CONTRACT AND/OR ANTICIPATORY BREACH
### (On behalf of Nationwide Breach Class and Kansas Subclass)

83.     The preceding paragraphs are incorporated by reference as if fully alleged herein.

84.     Plaintiff and the class purchased property coverage policies from Defendant.

85.     The Policies are valid and enforceable contracts between the Defendant and Plaintiff and class members.

86.     Plaintiff and the class substantially performed their obligations under the terms of the Policy including giving Defendant notice of the claim. Alternatively, Defendant has waived any terms or conditions of coverage and may not assert any term or condition in the Policy as a defense to liability.

87.     Plaintiff and the class have sustained a loss covered by the Policy arising from the COVID-19 virus and associated state and local Stay at Home orders.

88.     Defendant stated that the Policy does not provide coverage for COVID-19 related losses. Defendant is in breach of its obligations by refusing to provide coverage under the Policy. Moreover, upon information and belief, Defendant has refused or will refuse other, similar claims claiming that COVID-19 losses are not covered by the Policy. Defendant therefore unjustifiably refuses to pay for losses covered by the Policy, in breach of the Policy.

89.     Defendant has refused to pay claims related to COVID-19 on a uniform and class-wide basis, in breach of the Policies.

90.     Any conditions precedent to a claim for breach of contract under the Policies have occurred, been satisfied, or, in any event, should be excused or otherwise discarded on the basis of futility or other applicable law.

91.     As a direct and proximate result of Defendant's breaches, Plaintiff and the class have sustained damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, requests relief and judgment against Defendant as follows:

a.     That the Court enter an order certifying the class, appointing Plaintiff as representatives of the class, appointing Plaintiff's counsel as class counsel, and directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the class;

b.     For a judgment against Defendant for the causes of action alleged against it;

c.     For compensatory damages in an amount to be proven at trial;

d.      For a declaration that Defendant's conduct as alleged herein is unlawful and in material breach of the Policy;

e.      For pre-judgment and post-judgment interest at the maximum rate permitted by law;

f.      For Plaintiff's attorney's fees;

g.      For Plaintiff's costs incurred; and

h.      For such other relief in law or equity as the Court deems just and proper.

### <u>DEMAND AND DESIGNATION FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury on all issues so triable and designates Kansas City, Kansas, as the place of trial.

Date: July 23, 2020                              Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**

*s/ Patrick J. Stueve*
Patrick J. Stueve, KS Bar # 13847
Todd M. McGuire, KS Bar #19618
Bradley T. Wilders, D. Kan # 78301
Curtis Shank, KS Bar # 26306
Abby E. McClellan, D. Kan. # 78804
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:      816-714-7100
Facsimile:      816-714-7101
Email:          stueve@stuevesiegel.com
Email:          wilders@stuevesiegel.com
Email:          shank@stuevesiegel.com

**LANGDON & EMISON LLC**

J. Kent Emison      D. Kan. #78360
911 Main Street
PO Box 220
Lexington, Missouri 64067
Phone: (660) 259-6175

20

Fax: (660) 259-4571
kent@lelaw.com

**MILLER SCHIRGER LLC**

John J. Schirger          D. Kan. #78228
Matthew W. Lytle         D. Kan. #78109
Joseph M. Feierabend   D. Kan. #78350
4520 Main Street, Suite 1570
Kansas City, MO 64111
Telephone: (816) 561-6500
Facsimile:  (816) 561-6501
jschirger@millerschirger.com
mlytle@millerschirger.com
jfeierabend@millerschirger.com

**SHAFFER LOMBARDO SHURIN, P.C.**

Richard F. Lombardo  KS#22326
Dawn M. Parsons  KS#16346
Michael F. Barzee  KS#27217
Rachael D. Longhofer  KS#25451
2001 Wyandotte Street
Kansas City, MO 64108
816-931-0500
816-931-5775 (Fax)
rlombardo@sls-law.com
dparsons@sls-law.com
mbarzee@sls-law.com
rlonghofer@sls-law.com

*Attorneys for Plaintiff and the Proposed Classes*